348-07/PJG/GMV

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff Mascot Navigation Corp.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG2200)
Gina M. Venezia (GV 1551)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASCOT NAVIGATION CORP., | 07 cv 7105 ( S AS ) |
| Plaintiff | |
| - against - | **VERIFIED COMPLAINT** |
| JADE GLOBAL TRADING CORP. a/k/a JADE GLOBAL TRADING, INC. | |
| Defendant | |

Plaintiff MASCOT NAVIGATION CORP ("MASCOT NAVIGATION" or
"OWNERS") by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint
against Defendant JADE GLOBAL TRADING CORP. a/k/a JADE GLOBAL TRADING, INC.
("JADE GLOBAL" or "CHARTERERS"), alleges upon information and belief as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract
of charter party.  This case also falls under this Court's admiralty and maritime jurisdiction
pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C.
§1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, Plaintiff MASCOT NAVIGATION was and still is a foreign business entity duly organized and existing under the laws of a foreign country.

3.    At all times relevant hereto, and upon information and belief, Defendant JADE GLOBAL was and still is a domestic corporation organized and existing under the laws of the State of New York.

4.    On or about 28 May 2007, Plaintiff, as owners of the M/V GOLDEN GATE, entered into a maritime contract of charter party with Defendant JADE GLOBAL, on an Amended Asbatankvoy charter party form for a voyage from one safe port Black Sea to one safe port North China.  A copy of the charter party fixture, form and additional clauses is attached hereto as **Exhibit 1**.

5.    In accordance with the charter party, the vessel proceeded to the load port and OWNERS duly tendered the vessel to JADE GLOBAL.

6.    In breach of its charter party obligations, CHARTERERS failed to provide a cargo for loading resulting in the accrual of demurrage in the total amount of $759,000.00 (23 days x the demurrage rate of $33,000), which remains due and owing to OWNERS.

7.    Due to CHARTERERS' breach of the charter, the vessel was withdrawn from the charter on July 15, 2007, and OWNERS immediately sought a substitute voyage for the vessel in an effort to mitigate their damages.

8.    OWNERS entered into a substitute charter for the vessel for 7 August 2007, but will earn less freight on the substituted voyage than what would have been earned under the subject charter.

9.    Had JADE GLOBAL performed its charter party obligations, OWNERS would have earned lump sum freight of $3.2 Million and incurred expenses of $1.12 million, resulting in a net return to OWNERS of $2.08 Million.  On the substitute voyage, OWNERS will earn freight of $2 Million and incur expenses of $939,000.00, resulting in a net return to OWNERS of $1.061 Million on the substitute voyage.  CHARTERERS are liable to OWNERS for the difference of $1,019,000.

10.    Accordingly, by virtue of CHARTERERS' non-performance/breach of the charter party, OWNERS have suffered damages including (1) the loss of freight for the 7.5 time period between termination of the subject charter and the substitute voyage in the amount of $247,500.00 and (2) the difference in freight earned between the subject voyage and substitute voyage in the amount of $1,019,000.

11.    Based upon the foregoing, OWNERS have total claims for damages including demurrage and loss of freight relating to CHARTERERS' non-performance in the total sum of $2,025,500.00.

12.    The charter party provides that it is to be governed by English law and that any disputes between the parties are to be resolved by arbitration in London.

13.    OWNERS specifically reserve their right to arbitrate the substantive matters at issue and have commenced arbitration in London.

14.    This action is brought in aid of the London arbitration against CHARTERERS, to compel them to arbitrate, and to obtain security both for the claims as outlined above and for the additional sums which Plaintiff will incur in the way of anticipated attorney fees and arbitral costs in the arbitration, estimated by English solicitors at $410,913.00 (£203,402), which is

recoverable as part of the Plaintiff's claim under the governing English law. (Attached hereto as **Exhibit 2** is a breakdown prepared by English solicitors of the estimated costs to be incurred).

15.    This action is also brought to obtain security for interest, estimated at $346,537.25, through the completion of the arbitration (based upon 6.5% for 2.5 years), which is also recoverable as part of the Plaintiff's claim under the governing English law.

16.    Therefore, Plaintiff seeks an attachment pursuant to Rule B in the amount of USD $2,782,950.35.

17.    Upon information and belief, and after investigation, Defendant JADE GLOBAL cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant in the amount of $2,782,950.35 (collectively hereinafter, "ASSETS"), including but not limited to ASSETS at, moving through, or within the possession, custody or control of banking institutions including but not limited to ABN Amro, American Express Bank, Atlantic Bank, BNP Paribas, Bank of America, Citibank NA, Deutsche Bank Trust Co., HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Standard Chartered Bank, The Bank of New York, Wachovia and/or other institutions or such other garnishees who may be served with a copy of the process of Attachment issued herein.

WHEREFORE, Plaintiff JADE GLOBAL prays:

a.    That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear

and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.   That since Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of $2,782,950.35 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant including but not limited to such assets as may be held, received or transferred in its own name or for its benefit or as may be held, received or transferred for its benefit in its name at, moving through, or within the possession, custody or control of banking institutions including but not limited to: ABN Amro, American Express Bank, Atlantic Bank, BNP Paribas, Bank of America, Citibank NA, Deutsche Bank Trust Co., HSBC, HSBC USA Bank NA, JPMorgan Chase Bank, Standard Chartered Bank, The Bank of New York, Wachovia, and/or any other garnishee(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served; and

c.   That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d.   For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       August 9, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
MASCOT NAVIGATION CORP

By: _____
    Peter J. Gutowski (PG 2200)
    Gina M. Venezia (GV 1551)
    80 Pine Street
    New York, NY 10005
    (212) 425-1900
    (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York        )
                         ) ss.:
County of New York  )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by English solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Peter J. Gutowski

Sworn to before me this
9th day of August 2007

_____
Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009

# EXHIBIT 1

Print Copy for : Petraki Ageliki

---

Received Inc.MSG.: 1338528        Date: Fri 08/Jun/2007 15:47
From: <<tankers@optimashipbrokers.gr>>
Subject: M/T "GOLDEN GATE" / JADE GLOBAL - C/P DTD 28/5/2007 - FI
Included (2) Attachment Files: <JADE GLOBAL CHARTERING CLAUSES.DOC>
<GGQ88VII.DOC>
TO : <"POLEMBROS SHIPPING"<chartering@polembros.gr>>


TO..: "POLEMBROS SHIPPING"
FROM: "Optima Tankers"<tankers@optimashipbrokers.gr>
DATE: 08-JUN-2007 15:45
MSG.: 8446139

------- Recipients: ----------
TO: POLEMBROS SHIPPING // MRS VIKKI KOUMIS
TO: POLEMBROS SHIPPING
-----------------------------------


TO: POLEMBROS
ATTN: MS.V.KOUMIS


REVISED FINAL RECAP


RE  : M/T "GOLDEN GATE" / JADE GLOBAL - C/P DTD 28/5/2007 - FIXTURE RECAP
==========================================================================

WE ARE PLEASED TO RECAP THE FOLLOWING CLEAN FIXTURE AGREED TO TODAY
BETWEEN JADE GLOBAL TRADING AND POLEMBROS SHIPPING LTD WITH ALL SUBJECTS
DULY LIFTED AS PER BELOW AND ATTACHED TERMS AND CONDITIONS.


STRICTLY PRIVATE AND CONFIDENTIAL

ACCOUNT   : JADE GLOBAL TRADING INC.
OWNERS    : MASCOT MARITIME COMPANY, GREECE
MANAGERS  : POLEMBROS SHIPPING LTD
OPERATOR  : AS PER ATTACHED Q88
CPARTY    : ASBATANKVOY
CP DD     :  MAY 28, 2007

MT GOLDEN GATE
ALL DESCRIPTIONS AS PER ATTACHED Q88

VESSELS LAST THREE CARGOES ARE :
OWNERS PLS ADVISE

ITINERARY AT TIME OF FIXING AS FOLLOWS:
VSL SAILED SPORE 17/5/2007
ETA SUEZ 7TH JUNE PM
ETA BSS BATUMI 15TH JUNE 2007 PM AGW AND PROVIDED THAT NO DELAYS IN
TRANSITING
TURKISH STRAITS

FOR ONE VOYAGE

CARGO: CHOPT UPTO FULL CARGO FUELOIL (INENTION M100) ONE/TWO GRADES WVNS VTMLTBM135DFMLT165DF

OWNERS ADVISE VESSELS MAX INTAKE ABT 80.500 MT NO RESTRICTIONS

LOADING :
1 SAFE PORT BLACK SEA, INENTION BATUMI, BUT EXCLUDING SEA OF AZOV, CPC AT NOVO AND SUPSA.

DISCHARGE :
1 SAFE PORT NORTH CHINA N.S.O.B.I. ZHOUSHAN-DALIAN RANGE, INTENTION ZHOUSHAN,
BUT EXCLUDING CHINESE RIVER PORTS.

LAYCAN :
10-20.06.2007 (00:01-23:59) TO BE NARROWED BY OWNERS TO TWO (2) DAYS NO LATER THEN COB LONDON JUNE 6, 2007.

FREIGHT : USD 3.2 MLN LUMPSUM - FREIGHT TO BE PAID BEFORE BERTHING DISPORT

RATE IS BSS 1/1 AND INCLUDING PORT COST AND SUEZ CANAL FEES

L ME : 96HRS TTL SHINC

DEMURRAGE : USD 33.000 PDPR

GA / ARB LND , ENG LAW TO APPLY

MAX D/A AT LOADING PORT, INCL STS, USD 80,000 L/S TO BE FOR OWNERS ACCOUNT, THEREAFTER FOR CHRTRS ACCOUNT AND SETTLED DIRECTLY BY THEM.

TURKISH STRAIT TRANSIT CLAUSE
ANY DELAYS IN TRANSITTING TURKISH STRAITS IN EXCESS OF A TOTAL OF
48 HOURS (NORTH AND SOUTHBOUND) TO BE FOR CHARTERERS ACCOUNT, PAYABLE
AT THE DEMURRAGE RATE AS PART OF FREIGHT AGAINST OWNERS INVOICE.
SHOULD VESSEL NOT BE ABLE TO ARRIVE LOADPORT WITHIN CANCELLING DATE
DUE TO DELAYS IN PASSING TURKISH STRAITS, CANCELLING TO BE
AUTOMATICALLY EXTENDED AND THE NEW CANCELLING DATE TO BE 24 HOURS
AFTER VESSEL'S NEW ETA ONCE SHE CLEARS BOSPHOROUS NORTHBOUND.

BIMCO ISPS

G ARB LNDN - ENGLISH LAW

YORK ANTWERP RULES 1974 AS AMENDED 1994

EXXON EARLY LOADING CLAUSE TO APPLY

CONOCO WEATHER CLS EXCEPT IF LOAD/DISCH AT/VIA STS/SBM/SPM/
SEABUOY/SEALINE/OPEN SEA BERTH OR TERMINAL WHERE FULL TIME TO COUNT WPON
AND ANY EXPENSES DUE BAD WEATHER TO BE FOR CHRTRS A/C AND TO BE SETTLED
DIRECTLY BY THEM WHERE APPLICABLE

ANY TAXES AND/OR DUES ON FREIGHT AND/OR CARGO TO BE FOR CHARTERERS A/C AND TO
BE SETTLED DIRECTLY BY THEM

VESSEL TO BE ALLOWED TO BUNKER ON LADEN PASSAGE

MAX 3 HRS AWAITING CARGO DOCS TO BE FOR OWNERS ACCT

OWNERS WARRANT THAT THEY ARE MEMBERS OF ITOPF AND THAT THEY WILL REMAIN SO THROUGHOUT THE DURATION OF THIS CHARTER.

COMMISSION : TTL 3.75 PCT INCL 1.25PCT ADDCOM + 1.25PCT SOUNDTANKERS +

1.25PCT OPTIMA ON F/DF/DEMURRAGE.

ADDITIONAL TERMS/CONDITIONS AS PER ATTACHED JADE GLOBAL TRADING
CLAUSES WITH FOLL AMMENDMENTS:

cls11. PUMPING CLAUSE : first line after "maintain" insert "average"  third
       line after "maintain" insert "an average" At the end add " provided
one
       start up, not multiple starts."
cls14. SPEED : after "speed of" insert "11.5 knots"
cls15. AGENCY CLAUSE : after "agents" insert " provided competitive"
cls16. NOTICE OF READINESS CLAUSE : fifth line after " of the laydays"
insert "
       or vessel all fast whichever comes first."
cls17. CLAIM/TIME-BAR CLAUSE : fourth line after "discharging ports" insert
       "provided obtainable."
cls21. LIGHTERAGE CLAUSE :(delete see clause 20)
cls23. CAST IRON CLAUSE :(delete)
cls27. REPRESENTATIVE CLAUSE : second line afert "discharging ports" insert
       "max 2 reps"
cls30. STATEMENT OF FACTS : first paragraph at the end insert "provided
       obtainable"
cls34. ADHERENCE TO VOYAGE INSTRUCTIONS : first line after "for any" insert
       "direct", third line after "for any" insert "direct"
cls38. CONOCO WEATHER CLAUSE :(DELETED, see main terms)


END CLEAN RECAP

THANK YOU FOR YOUR EFFORTS RESULTING IN THIS CLEAN FIXTURE.


BEST REGARDS

KONSTANTINOS ANNIVAS
OPTIMA TANKERS
--------------------
OFFICE: +30-210-8900024
MOB: +30-6977320544
YAHOO ID: c_annivas
E-MAIL : tankers@optimashipbrokers.gr
WEBSITE: www.optimashipbrokers.gr

## JADE GLOBAL CHARTERING CLAUSES

1) ELIGIBILITY CLAUSE ............................................................................ 2
2) CIVIL LIABILITY CONVENTION CLAUSE ......................................... 2
3) IOPP and SOLAS REGULATIONS ....................................................... 2
4) YORK/ANTWERP RULES ....................................................................... 2
5) GENERAL AVERAGE and ARBITRATION .......................................... 2
6) ITOPF/P&I ................................................................................................. 2
7) BALLAST ................................................................................................... 2
8) SLOPS ........................................................................................................ 3
9) ITF CLAUSE ............................................................................................. 3
10) CREW PERFORMANCE CLAUSE ........................................................ 3
11) PUMPING CLAUSE ................................................................................. 3
12) HEATING CLAUSE ................................................................................. 3
13) ETA CLAUSE ........................................................................................... 3
14) SPEED ....................................................................................................... 4
15) AGENCY CLAUSE ................................................................................... 4
16) NOTICE OF READINESS CLAUSE ....................................................... 4
17) CLAIM/TIME-BAR CLAUSE .................................................................. 4
18) INSURANCE CLAUSE ............................................................................ 4
19) BUNKER SURVEY AND SAMPLE CLAUSE ....................................... 4
20) VESSEL TO VESSEL LIGHTERING CLAUSE ..................................... 5
21) LIGHTERAGE CLAUSE (delete see clause 20)...**Error! Bookmark not defined.**
22) INERT GAS SYSTEM CLAUSE ............................................................. 5
23) CAST IRON CLAUSE (delete) .............................**Error! Bookmark not defined.**
24) CARGO RETENTION CLAUSE .............................................................. 5
25) BILL OF LADING ..................................................................................... 6
26) CLEAN ON BOARD CLAUSE ................................................................ 6
27) REPRESENTATIVE CLAUSE ................................................................ 6
28) SHIFTING/DEBALLASTING CLAUSE .................................................. 6
29) LOAD ON TOP CLAUSE ......................................................................... 7
30) STATEMENT OF FACTS ........................................................................ 7
31) SAMPLING ............................................................................................... 7
32) BLACK LIST CLAUSE ............................................................................ 7
33) EXCESS BERTH OCCUPANCY ............................................................ 7
34) ADHERENCE TO VOYAGE INSTRUCTIONS .................................... 8
35) SHIP'S PURPOSE .................................................................................... 8
36) CHEVRON WAR RISK ........................................................................... 8
37) CLEANING CLAUSE ............................................................................... 8
38) CONOCO WEATHER CLAUSE (DELETED, see main terms) **Error! Bookmark not defined.**
39) ADDITIONAL CLAUSES ........................................................................ 9
40) MARPOL .................................................................................................... 9

## 1) ELIGIBILITY CLAUSE

To the best of owners knowledge the vessel is in all respects eligible for trading within, to and from ranges and areas specified in the Charter Party and that at all times she shall have on board all necessary certificates, records and other documents required for such services. Furthermore, owners warrant that the vessel is completely free to trade within IWL and is not in any way listed as unacceptable by any, government organisation, nor is she debarred by any activity of any port within load or discharge areas within agreed ranges.

## 2) CIVIL LIABILITY CONVENTION CLAUSE

Owner warrants that the vessel performing under this charter carries on board a certificate of insurance as required by the civil liability convention. Owner further warrants that said certificate will be maintained effective throughout the duration of performance under this charter. Charterers shall not be liable for demurrage as a result of owner's failure to have on board the aforementioned certificate.

## 3) IOPP and SOLAS REGULATIONS

Owner warrants vessel is in compliance with latest IOPP and Solas Regulations.

## 4) YORK/ANTWERP RULES

York/Antwerp Rules 1974 to apply (as amended 1994).

## 5) GENERAL AVERAGE and ARBITRATION

General Average and Arbitration in London, English Law Arbitration Act 1950-1979 to apply.

## 6) ITOPF/P&I

Owners warrant that throughout the duration of this charter, the vessel will be:

1. owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited (ITOPF) and

2. entered in the American Protection and Indemnity (P and I)

## 7) BALLAST

Vessel to arrive loadport with clean segregated ballast.

## 8) SLOPS

No freight is payable on slops carried on board.

## 9) ITF CLAUSE

Vessel to be approved by ITF or equivalent. Any losses expenses or damages arising as a result of failure to comply with ITF or equivalent regulations as interpreted by local union will be for Owner's account.

## 10) CREW PERFORMANCE CLAUSE

It is understood and agreed that vessel's crew will be required to assist in handling fenders, cargo hoses as well as mooring and unmooring as designated by the Mooring Master.

Owner guarantees to maintain a full and complete officer and crew compliment on board at all times vessel is on charter to charterers

## 11) PUMPING CLAUSE

Owner warrants that vessel will discharge cargo in maximum twenty four (24) hours and maintain 100 PSI at the ship's rail during discharge. Any delays in port due to inability of vessel to discharge this cargo in twenty four (24) hours and maintain 100 PSI at the ship's rail (provided shore facilities can accept this discharge rate and pressure) will be for Owner's account and will not count as laytime, or if vessel is on demurrage, as demurrage. Vessel may be withdrawn from the berth because of its failure to maintain discharge rate and all time and expenses so incurred will be for Owner's account. Discharge terminal shall have the right to gauge line pressure.

## 12) HEATING CLAUSE

Owner guarantees vessel is capable of and will maintain 135 degrees Fahrenheit in all tanks throughout voyage and discharge (provided cargo loaded with temperature minimum 135 degrees Fahrenheit). Should the vessel fail to maintain this temperature required, the owner shall be responsible for any resulting delay(s) and time lost shall not count as laytime, or if vessel is on demurrage, as demurrage.

## 13) ETA CLAUSE

Provided stated in voyage orders. Vessel shall conform with loading docking procedures and port regulations as may be in force from time to time and master to give 72/48/24 hours notice of arrival to loadport unless stipulated differently in voyage orders. Failure to give any notice at least 24 hours in advance of arrival will increase the laytime allowed to Charterer by an amount equal to the difference between 24 hours and the number of hours prior to

arrival that notice of such eta is received by supplier at loadport, provided orders have been sufficiently early.

## 14) SPEED

Owner warrants vessel will perform at a speed of _____ knots, weather permitting on both ballast/laden passages.

## 15) AGENCY CLAUSE

Owners shall appoint Charterer's nominated agents  at load and discharge ports.

## 16) NOTICE OF READINESS CLAUSE

Vessel not to tender Notice of Readiness prior to commencement of laydays unless otherwise instructed to do so by Charterers. If at port of loading notice of readiness is given prior to commencement of laydays, laytime shall not begin to run until the lapse of six (6) hours after 0001 hours on the first day of the laydays. If loading starts prior commencement of laydays, then time to commence counting when vessel is all fast alongside. Charterers shall always be allowed the benefit of 6 hours notice at load and discharge ports even if vessel is already on demurrage.

## 17) CLAIM/TIME-BAR CLAUSE

Demurrage/deviation/bunkers/charter party claim, if any, shall be payable by Charterers after presentation of Owner's invoice supported by master/agents time sheets, notices, pumping log and relevant documents duly signed by suppliers respectively receivers at loading and discharging ports. Charterers must be presented with any written claims within 90 days (holidays, Saturday, Sunday excluded) after completion of discharge failing which such claims cannot be considered binding upon Charterers.

## 18) INSURANCE CLAUSE

Any extra insurance on freight and/or cargo due to vessels age classification and/or flag to be for Charterer's account.

## 19) BUNKER SURVEY AND SAMPLE CLAUSE

Owners to allow Charterers Independent Inspector to survey and take samples at Charterers time/risk/expense and settled directly by them of bunker tanks and cofferdams at time of vessels loading and discharge with extra time if any

to count as laytime. Owners to permit inspection and copying of engine and deck logs.

## 20) VESSEL TO VESSEL LIGHTERING CLAUSE

Any STS transfer to be safe, in accordance with OCIMF guidelines and at charterer's time risk and expense I.E. owners not to be obliged to make any remittances for expenses, disbursments nor agency fees, and full time to count wpon.

## 21) LIGHTERAGE CLAUSE

If lightering is required to berth at any designated port, and it is necessary to lighter the vessel while at a customary lightering anchorage for said port, laytime at anchorage (whether or not the vessel is on demurrage) shall begin six hours after receipt of Notice of Readiness by Charterers or when first lighter barge arrives alongside whichever occurs first, and shall end when the last lighter barge disconnects hoses.

## 22) INERT GAS SYSTEM CLAUSE

If vessel is equipped with inert gas system and vessel's cargo compartments are inerted, master may be requested by terminal personnel or independent inspectors to depressurize those tanks for purposes of gauging, sampling, temperature determination and/or determining the quantity of cargo remaining on board after discharge. Master shall comply with these requests commensurate with safety. All time, risk and expense to be for charterers account and settled directly by them.

## 23) CAST IRON CLAUSE

Owner warrants that all riser valves and fittings, outboard of the last fixed rigid support to the ship's deck, that are used in the transfer of cargo of ballast, will be made of steel or modular iron and that only one steel reducer or spacer will be used between the ship's valve and the loading arm. The fixed rigid support must be designed to prevent both lateral and vertical movement of the transfer manifold.

## 24) CARGO RETENTION CLAUSE

In the event that any cargo remains on board the vessel upon completion of discharge, Charterer shall have the right to claim an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto, provided that the volume of cargo remaining on board is liquid, reachable and

pumpable by vessels fixed equipment as determined by an independent surveyor.

An action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties. Nothing in this clause shall be construed as an acknowledgement or admission of any pre-determined or standard allowance for any threatened cargo loss.

## 25) BILL OF LADING

Discharge port shown in Bill of Lading not to constitute a declaration of discharge port and Charterers to have right to order vessel to any port within terms of the Charter Party. Charterers hereby indemnify Owners against claims brought by holders of Bills of Lading against Owners by reason of change of destination.

Should Bills of lading not arrive at discharge port in time, then Owners agree to release the entire cargo without presentation of the original Bills of Lading against delivery by Charterers of mutually acceptable Letter of Indemnity in accordance with Owners P and I Club wording, no bank guarantee, signed by Jade Global Trading Corp, which letter of Indemnity shall be limited to deal exclusively with all claims of holders of originally Bills(s) of Lading in relation to discharge of cargo without presentation of original Bills of Lading and shall automatically become null and void against presentation of 1 out of 3 original Bills of lading, or after 13 months after completion of discharge, whichever occurs first.

## 26) CLEAN ON BOARD CLAUSE

Provided stated in voyage orders Original Bills of Lading to be marked "CLEAN ON BOARD" and same to be signed by owners accordingly, "CLEAN" in this context refers to the condition of the documentation, that is a clean bill of lading without clauses or blemishes or excepting upon it. "CLEAN" in this context does not refer to the quality or condition of the commodity.

## 27) REPRESENTATIVE CLAUSE

Owners to permit Charterer's representative on board the vessel at loading and discharging ports. All time, risk and expense to be for charterers account and settled directly by them.

## 28) SHIFTING/DEBALLASTING CLAUSE

All time handling deballasting/ballasting operation and shifting time not to count as used laytime even if vessel is already on demurrage.

## 29) LOAD ON TOP CLAUSE

Unless otherwise instructed, Owners shall collect and dispose of tank washings and, in so far as such tank washings cannot be disposed of, shall collect tank washings in one tank which shall not have been included in the minimum capacity of the vessel guarantee to be available to Charterers, and no freight shall be payable on said tank washings.

Charterers may instruct vessel to load on top of collected tank washings in which case freight as agreed shall be payable on the quantity of such collected tank washings, provided that Owners shall ensure that the free water in such collected tank washings have been reduced to a minimum to Charterer's Inspector satisfaction.

## 30) STATEMENT OF FACTS

Provided stated in voyage orders, In order to be considered an authorised document Statement of Facts must be signed by Master of vessel, vessel's Agent and supplier and/or receiver.

If Owners nominate Agents at load and/or discharge ports said Agents to release port information to Charterers if/and as requested and to forward to Charterers Statement of Facts and N.O.R. as soon as possible after vessel's discharge.

## 31) SAMPLING

Charterers option for vessel to call port enroute from load port(s) to discharge port(s) for sampling purposes. All costs in this connection to be for Charterer's account based on demurrage rate for deviation plus bunker cost at replacement value payable together with freight. Replacement value to be as per owners latest purchase price against relevant supporting documents where obtainable.

## 32) BLACK LIST CLAUSE

Owners guarantee that the vessel is not precluded from due and normal performance under this Charter Party by Virtue of any previous trading.

## 33) EXCESS BERTH OCCUPANCY

If, after disconnection of hoses, vessel remains at berth exclusively for ship's purposes, other than by reasons of force majeure, Owners will be responsible for direct or indirect costs charged to Charterer by terminal/suppliers/receivers.

## 34) ADHERENCE TO VOYAGE INSTRUCTIONS

Owners shall be responsible for any time, costs, delays or losses suffered by Charterers due to failure to comply fully with Charterers voyage instructions. Owners shall be responsible for any time, costs, delays or losses associated with vessel loading cargo quantity in excess of voyage orders.

## 35) SHIP'S PURPOSE

After loading Master/Owners may elect to have vessel call at a port enroute to discharge port, for bunkers, supplies, spares, refuge, etc. Any call at a port for the above reason will be treated according to Charter Party terms, conditions and exceptions.
However, Master/Owner will inform Charterers immediately as call is scheduled as follows:-

scheduled call date and estimated length of stay
reason for call
arrival date/time
departure date/time
new ETA load/discharge port

If Owners fail to immediately inform Charterer of the above, all time, delays and costs by reason of unexpected late arrival at discharge port will be for Owners' account.

## 36) CHEVRON WAR RISK

Any increase of hull and machinery war risk premiums, and crew war bonus over and above those in effect on date of the Charter Party, will be for Charterer's account. Any premiums, or increase thereto, attributable to closure (i.e. blocking and trapping) insurance shall be for Owner's account.

Surcharges which are in effect on the date of this Charter Party are for Owner's account. Owner to pay war risk premiums/crew war bonus for first 14 days, thereafter for Charterer's account.

## 37) CLEANING CLAUSE

Vessel to arrive at loadport with all cargo tanks, pumps and pipes suitably clean to Charterers' Inspector's satisfaction in accordance with Clause 18 of this Charter Party, and further, Owners to ensure that all traces of sediment, tank washings or chemicals, if used, are removed from tanks, pumps and pipes intended for carriage of designated cargo. Any delays as a result of vessel arriving at loadport, and not being in suitable condition to load the designated cargo, to be for Owner's account, and time not to count.

8

## 38) CONOCO WEATHER CLAUSE

Delays in berthing for loading and discharging and any delays after berthing which are due to weather conditions shall count as one half laytime or if on demurrage, at one half demurrage rate.

## 39) ADDITIONAL CLAUSES

1. The rule "once on demurrage always on demurrage" shall not apply to this charter party.

2. Laytime to cease at hoses disconnection at loading and discharging ports. If in the event vessel is delayed by cargo documentation at loadport(s), then Charterers to be allowed 3 hours for documentation time. However if vessel is concurrently waiting for daylight/tide/tugs/pilots/weather/port regulations then time used shall not count as laytime used or at demurrage if on demurrage.

3. Owners warrant vessel complies with Exxon Drug and Alcohol Clauses.

4. This fixture shall remain strictly private and confidential.

5. BIMCO ISM clause

6. BIMCO ISPS clause

7. INTERIM LOAD / DISCHARGE PORT

Charterer shall pay for any interim load/discharge port(s) or berth(s) at cost. Time for additional steaming, which exceeds direct route from first load to final discharge as well as time used in port/berth/STS (WPON), shall be paid at the demurrage rate plus bunkers consumed. All port costs including agency fees to be for charterers account and to be settled directly by them. Costs will be payable as on an account payment together with freight as per Owner's telex/email invoice, followed by all supporting documents as soon as possible if requested by Charterers'.

## 40) MARPOL

Vessel to comply with IMO rules of MARPOL ANNEX I, 13G & H

F 17-0.1                ASBATANKVOY                    17–2.3

4. Naming Loading And Discharge Ports. (a). The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

*On a voyage to a port or ports in:*

ST. KITTS    Carribean or U.S. Gulf loading port(s)
PORT SAID    Eastern Mediterranean or Persian Gulf loading port(s)
             (from ports west of Port Said.)

(b). If lawful and consistent with Port I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

*Place*      *On a voyage to a port or ports in:*
LAND'S END   United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark)
SUEZ         Mediterranean (from Persian Gulf)
GIBRALTER    Mediterranean (from Western Hemisphere).

(c). Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. Laydays. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. Notice Of Readiness. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. Hours For Loading And Discharging. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the

(Rd.52-8/90  Pub.130)

Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. Demurrage. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. Safe Berthing-Shifting. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. Pumping In And Out. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires

F 17-0.1                    ASBATANKVOY                    17–2.5

on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. Hoses: Mooring At Sea Terminals. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. Dues—Taxes—Wharfage. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). Cargoes Excluded Vapor Pressure. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b). Flash Point. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). Ice. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or, radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio order for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b). If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if avail-

(Rel.52–8/90  Pub.130)

able, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. **Two Or More Ports Counting As One.** To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only; subject to the following conditions:

(a). Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b). All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c). Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d). Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. **General Cargo.** The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17. **(a). Quarantine.** Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b). **Fumigation.** If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. **Cleaning.** The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or

(Rel.52–8/90  Pub.130)

fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. General Exceptions Clause. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from: — any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner, the navigation or management of the Vessel, fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from: — Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. Issuance And Terms Of Bills Of Lading. (a). The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b). The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i). Clause Paramount. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have

(Rel.52–8/90    Pub.130)

effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii). Jason Clause. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii). General Average. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner' and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) Both To Blame: If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or, any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The fore-

F 17-0.1                    ASBATANKVOY                    17–2.9

going provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) Limitation Of Liability. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) War Risks. (a). If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b). If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge — the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c). The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other

(Rel.52–8/90  Pub.130)

government or local authority including any de facto government or local
authority or by any person or body acting or purporting to act as or with the
authority of any such government or authority or by any committee or per-
son having under the terms of the war risks insurance on the vessel the right
to give any such directions or recommendations. If by reason of or in compli-
ance with any such directions or recommendations, anything is done or is not
done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommenda-
tion the Vessel does not proceed to the port or ports of discharge originally
designated or to which she may have been ordered pursuant to the terms of
the Bills of Lading, the Vessel may proceed to any safe port of discharge
which the Master or Owners in his or their discretion may decide on and
there discharge the cargo. Such discharge shall be deemed to be due fulfill-
ment of the contract or contracts of affreightment and the Owners shall be
entitled to freight as if discharge has been effected at the port or ports origi-
nally designated or to which the vessel may have been ordered pursuant to
the terms of the Bills of Lading. All extra expenses involved in reaching and
discharging the cargo at any such other port of discharge shall be paid by
the Charterers and/or Cargo Owners and the Owners shall have a lien on the
cargo for freight and all such expenses.

(vii). Deviation Clause. The Vessel shall have liberty to call at any ports
in any order, to sail with or without pilots, to tow or to be towed, to go to the
assistance of vessels in distress, to deviate for the purpose of saving life or
property or of landing any ill or injured person on board, and to call for fuel
at any port or ports in or out of the regular course of the voyage. Any sal-
vage shall be for the sole benefit of the Owner.

21. Lien. The Owner shall have an absolute lien on the cargo for all
freight, deadfreight, demurrage and costs, including attorney fees, of recov-
ering the same, which lien shall continue after delivery of the cargo into the
possession of the Charterer, or of the holders of any Bills of Lading covering
the same or of any storageman.

22. Agents. The Owner shall appoint Vessel's agents at all ports.

23. Breach. Damages for breach of this Charter shall include all provable
damages, and all costs of suit and attorney fees incurred in any action here-
under.

24. Arbitration. Any and all differences and disputes of whatsoever na-
ture arising out of this Charter shall be put to arbitration in the City of New
York or in the City of London whichever place is specified in Part I of this
charter pursuant to the laws relating to arbitration there in force, before a
board of three persons, consisting of one arbitrator to be appointed by the
Owner, one by the Charterer, and one by the two so chosen. The decision of
any two of the three on any point or points shall be final. Either party hereto
may call for such arbitration by service upon any officer of the other, wher-
ever he may be found, of a written notice specifying the name and address of
the arbitrator chosen by the first moving party and a brief description of the
disputes or differences which such party desires to put to arbitration. If the

other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. **Sublet.** Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. **Oil Pollution Clause.** Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oil residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board un-

(Rel.52–8/90  Pub.130)

17–2.12            TANKER CHARTER PARTIES            F 17-0.1

der Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total dead-weight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

(Rel.52–8/90  Pub.130)

# EXHIBIT 2

**GOLDEN GATE – C/p dated 28 May 2007**

**Cost estimate for London arbitration**

| Step/disbursement | Cost |
|---|---|
| Submissions | £3,038 |
| Proof key witnesses (2, 1 ops, 1 ship) | £2,170 |
| Review key documents | £2,170 |
| Identify experts (1, financial – market loss) | £2,170 |
| Preliminary meeting | £3,689 |
| Review submissions/interim application | £5,859 |
| Prepare documents for disclosure | £2,170 |
| Inspection | £1,085 |
| Witness statements | £4,340 |
| Expert reports | £2,170 |
| Reviewing other side's witness statements/expert reports | £4,340 |
| Settlement | £4,340 |
| Preparation for hearing | £32,550 |
| Hearing (2 day oral hearing) | £8,680 |
| Considering issues arising on documents/ correspondence with clients and other side | £23,631 |
| Expert | £21,000 |
| Counsel | £43,000 |
| Tribunal's fees | £30,000 |
| Arbitration venue | £2,000 |
| Travel/subsistence (legal representative/witnesses) | £5,000 |
| **TOTAL** | **£203,402** |

Eversheds LLP
06 August 2007